UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BEAUMONT HOSPITAL-WAYNE F/K/A
OAKWOOD ANNAPOLIS HOSPITAL,

        Plaintiff,

                                  Case No. 18-12352
v.                                District Judge Victoria A. Roberts
                                Magistrate Judge Mona K Majzoub

ALEX AZAR II, IN HIS
OFFICIAL CAPACITY AS SECRETARY
OF HEALTH AND HUMAN SERVICES,

        Defendant.
_____/

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [ECF No. 24] AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [ECF No. 26]

## I.    INTRODUCTION

This dispute is about money. It concerns the Medicare program's determination, for reimbursement purposes, of Beaumont's graduate medical education ("GME") and indirect medical education ("IME") Medicare funding.

The Medicare program imposes a unique and specific cap on the number of full time equivalent ("FTE") residents for which Medicare will pay a teaching hospital for training purposes. The higher the number of FTEs

1

family medical residents a hospital can claim, the larger the amount of potential reimbursement payment a hospital might receive under the Medicare Statute.

The Secretary of the Department of Health and Human Services ("the Secretary") – through the Centers for Medicare and Medicaid Services ("CMS") – is responsible for administering the Medicare statute, Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.*

The applicable statutes, regulations, and rules governing the dispute are set forth below.

| Name | Statute/Regulation | Application |
|------|--------------------|-------------|
| Medicare Act | Title XVIII of the Social Security Act | Establishing Medicare Payment for Teaching Hospitals |
| | 42 U.S.C. § 1395ww | Providing for payment of direct and indirect costs associated with GME |
| 2007 Regulation | 42 C.F.R. § 413.79(e)(1) (2007) | Governing regulation for determining the unique, hospital-specific FTE cap |
| 2012 Regulation | 42 C.F.R. § 413.79(e)(1) (2012) | Governing regulation for determining the unique, hospital-specific FTE cap |
| Preamble (1999) | 64 FR 41519 - 41520 | Addresses rotations to other hospitals for both whole years and partial years (explaining regulations set forth by the Secretary) |

Beaumont Hospital-Wayne ("Beaumont") seeks judicial review of the Administrator's decision denying additional reimbursement – by lowering its

FTE cap – under the Medicare Act for costs it incurred in training medical residents during fiscal years 2004 through 2007.

Before the Court are Plaintiff's and Defendant's Cross-Motions for Summary Judgment, Plaintiff's and Defendant's Opposition to each, the Administrative Record, and the parties Joint Statement of Undisputed Material Facts.

For the reasons set forth below, Defendant's Motion for Summary Judgment is **GRANTED** and Plaintiff's Motion for Summary Judgment is **DENIED**.


## II. BACKGROUND

### A. Statutory And Regulatory Background

Medicare provides health insurance to elderly and disabled persons. *See* 42 U.S.C. §§ 1395–1395cc. CMS administers the program for the Secretary. *See* 42 U.S.C. § 1395kk; 42 C.F.R. § 400.200 *et seq.* Hospitals that render services to Medicare patients are reimbursed for a portion of their expenses according to Title XVII of the Social Security Act (the "Medicare Act"), 42 U.S.C. § 1395 *et seq.*

The Medicare statute consists of two main parts: Part A and Part B. Medicare Part A authorizes payment for services including, hospital care,

related post-hospital care, home health services, and hospice care to Medicare beneficiaries. *See* 42 U.S.C. § 1395c *et seq.* Part B pays for services not covered by Part A, including physician services and hospital outpatient services. 42 U.S.C. §§ 1395j-1395w. Medicare also reimburses teaching hospitals for the cost of graduate medical education, including physician time attributable to instruction and supervision of interns and residents. 42 U.S.C. § 1395ww(h).

Under Part A, hospitals with approved medical residency programs are entitled to reimbursement for certain costs, which includes a GME payment and an IME payment. *See* 42 U.S.C. §§ 1395ww(d)(5)(B), (h). GME encompasses costs, such as residents' salaries, compensation paid to teaching physicians and supervisors, and limited fringe benefits. *See* 42 U.S.C. § 1395ww(h); 42 C.F.R. § 413.86(b)(3) (1998). IME costs include higher-than-average operating costs incurred as an indirect result of having a teaching program. *See* 42 U.S.C. §§ 1395f(b), 1395ww(d)(5)(B); 42 C.F.R. § 412.105 (1998).

Medicare's standard payment rates do not include reimbursement for GME costs. *See* 42 C.F.R. §§ 412.2(a)(1), 419.2(f)(7), 412.1(c)(1). As a result, CMS pays hospitals a separate payment for GME costs, which is determined pursuant to 42 C.F.R. § 413.86(d) (1998). These amounts are

based on the "average per resident amount" payment methodology and determined annually. *See* 42 U.S.C. § 1395ww(h).

The GME payment is equal to the product of the hospital's average per resident amount—derived from a 1984 base period—multiplied by the number of FTE residents in an approved residency program during the cost reporting period, times the hospital's Medicare patient load. *See* 42 U.S.C. § 1395ww(h)(3). For GME payment, section 1886(h)(2) states that "[t]he Secretary shall determine, for each hospital with an approved medical residency training program, an approved FTE resident amount for each cost reporting period beginning on or after July 1, 1985."

Additional payments are also made for IME. The amounts vary by the number of FTEs in a hospital's residency programs and number of beds. *See* 42 U.S.C. § 1395ww(d)(5)(B)(ii). IME payment is issued pursuant to section 1886(d)(5)(B):

> "The Secretary shall provide for an additional payment amount for subsection (d) hospitals with indirect costs of medical education, in an amount computed in the same manner as the adjustment for such costs under regulations (in effect as of January 1, 1983) under subsection (a)(2), except as follows: ***
>
> (v) In determining the adjustment with respect to a hospital for discharges occurring on or after October 1, 1997, the total number of full-time equivalent interns and residents in the fields of allopathic and osteopathic medicine in either a hospital or nonhospital setting may not exceed the number (or, 130 percent of such number in the case of a hospital located in a rural area) of such full-time equivalent interns and

residents in the hospital with respect to the hospital's most recent cost reporting period ending on or before December 31, 1996. The provisions of subsections (h)(4)(H)(vi), (h)(7), and (h)(8) shall apply with respect to the first sentence of this clause in the same manner as it applies with respect to subsection (h)(4)(F)(i)."

Section 1886(h)(4)(F) and (G).

The Balanced Budget Act of 1997 ("BBA") imposes caps on the number of FTEs a hospital may claim – with limited exceptions – using 1996 as the base year. *See* Pub.L. No. 105–33; 42 U.S.C. § 1395ww(h)(4)(F). The cap limits the number of FTEs for which a hospital can claim GME/IME reimbursement to the number of FTEs claimed by the hospital for the last cost reporting period ending on or before December 31, 1996. *See* Pub.L. No. 105–33; 42 U.S.C. § 1395ww(h)(4)(F).

The BBA created some exemptions to the FTE caps for hospitals seeking reimbursement for GME and IME expenses. For example, the BBA directed the Secretary to promulgate rules for the application of FTE caps to new medical residency training programs established on or after January 1, 1995. *See* 42 U.S.C. § 1395ww(d)(h)(H)(i). Under section 1886(h)(4)(H)(i) of the Act, as added by the BBA, the Secretary is required to establish rules with respect to the counting of residents in medical residency training programs established on or after January 1, 1995.

The parties agree that the governing regulation used to determine the hospital specific cap is 42 C.F.R. §§ 413.79(e)(1). However, the parties dispute (i) whether the 2007 version or the 2012 version of the regulation is a clarification or new enactment and (ii) the calculation of GME and IME costs pursuant to the 2007 regulation.

The 2007 regulation said hospitals – that began resident training for the first time in a new residency program on or after January 1, 1995 – had to adhere to this regulation:

> [T]he hospital's unweighted FTE resident cap under [§ 413.79(c)] may be adjusted based on the product of the highest number of residents in any program year during the third year of the first program's existence for all new residency training programs and the number of years in which residents are expected to complete the program based on the minimum accredited length for the type of program. The adjustment to the cap may not exceed the number of accredited slots available to the hospital for the new program.

42 C.F.R. §§ 413.79(e)(1) (2007).

The preamble to this final rule addressed rotations to other hospitals for both whole years and partial years. *See* 64 Fed. Reg. 41519 – 41520 ("In situations where the residents spend partial years at different hospitals during the first 3 years of the new residency program, each hospital that trains the residents receives an adjustment to its cap based on product of the highest number of residents in any program year during the third year of the first program's existence and the minimum accredited length of the

program"). While CMS stated that the July 31, 1999 Federal Register addressed how to calculate the FTE resident caps for whole year out-rotations and partial year out-rotations, it noted that this point could have been more clearly articulated.

In 2012 – amid confusion regarding residents who rotate outside the teaching hospital – CMS revised the regulation to state:

> [T]he hospital's unweighted FTE resident cap under [§ 413.79(c)] may be adjusted for new residency training programs based on the sum of the products of the highest number of FTE residents in any program year during the third year of the first new program's existence and the number of years in which residents are expected to complete the program based on the minimum accredited length for each type of program. The adjustment to the cap may not exceed the number of accredited slots available to the hospital for the new program….
>
> (i) If a hospital begins training residents in a new medical residency training program(s) for the first time on or after January 1, 1995, but before October 1, 2012, and if the residents are spending portions of a program year (or years) at one hospital and the remainder of the program at another hospital(s), the adjustment to each qualifying hospital's cap for a new medical residency training program(s) is equal to the sum of the products of the highest number of FTE residents in any program year during the third year of the first new program's existence and the number of years in which residents are expected to complete the program based on the minimum accredited length for each type of program and the number of years the residents are training at each respective hospital….

42 C.F.R. § 413.79(e)(1)(i) (2012). In effect, the 2012 regulation clarified the confusion by explicitly excluding time that a resident spent for a portion of the year training at another teaching hospital.

### B. Factual and Procedural Background

Beaumont Hospital Wayne — formerly known as Oakwood Annapolis Hospital —is an acute care inpatient hospital organized as a Michigan nonprofit corporation located in Wayne, Michigan. *See* Administrative Record ("AR") at 26. Secretary Alex M. Azar ("Secretary") is the Secretary of Heath and Human Services and is responsible for the administration of the Medicare Program. *See* AR at 27. The Secretary delegated administration of the Medicare Program to CMS. *Id.*

Because Beaumont had not previously participated in a family medicine residency training program, it had a cap of zero FTEs. On July 1, 2004, Beaumont established a new family medicine training program. Thereafter, Beaumont applied the FTE caps on an aggregate basis and gained access to a Medicare reimbursement it would otherwise not have been entitled to receive otherwise. Beaumont had a three-year window for establishing its FTE resident cap; the ACGME approved the program for 30 positions.

During the first three years of the program, some residents spent time training at two other hospitals – Beaumont Hospital-Dearborn and Beaumont Hospital-Trenton. Residents out rotated to Beaumont Trenton and Beaumont

Dearborn because Beaumont Wayne could not provide the necessary training onsite.

For the 2007 fiscal year, Beaumont requested that its fiscal intermediary—a private insurance company Medicare contracts to pay certain bills—include 30 FTEs for its family medicine program.

In calculating Beaumont's FTE resident caps, the Medicare Administrative Contractor (MAC) – who serves as the agent for the Secretary for administering the Medicare program – apportioned caps based on the percentage of time spent training at the hospital.

To obtain reimbursement from Medicare, a hospital must submit a cost report to a MAC. *See* 42 U.S.C. §§ 1395h(a), 1395kk–1(a)(4). The MAC reviews the hospital's cost report and then issues a final determination — known as a "notice of program reimbursement" (NPR). The NPR establishes the total amount the hospital should be reimbursed for services rendered to Medicare beneficiaries during a specified reporting period. The MAC calculated Beaumont's FTE caps by apportioning the caps for GME and IME to be 23.96 and 23.87, respectively. AR at 480.

If a hospital "is dissatisfied with [the] final determination ... as to the amount of total program reimbursement due," it may appeal to the Provider Reimbursement Review Board (PRRB). *See* 42 U.S.C. § 1395*oo* (a). The

PRRB has authority to decide certain issues, but not those that question the Secretary's interpretation of the Medicare statute. *Id.* § 1395*oo* (f)(1); *see also* 42 C.F.R. § 405.1842(f)(1)(ii).

Beaumont appealed the MAC's decision to PRRB, which is composed of "representative[s] of providers" and other persons "knowledgeable in the field of" provider payments. 42 U.S.C. § 1395*oo*(h). After a formal hearing, the PRRB determined the MAC "improperly calculated the provider's GME and IME FTE resident caps" and directed the MAC to adjust Beaumont's "new family medicine training program cap to 29.28 for both [D]GME and IME." AR 98-99. The board concluded the administrative regulation governing a hospital's FTE count was unambiguous and that this regulation did not exclude residents' rotating within other hospitals from Beaumont's FTE count for purposes of calculating the amount to be reimbursed the hospital could include residents and time spent at other hospitals. *See* 42 C.F.R. § 412.105(g)(1).

The Secretary, acting through the Administrator of the Centers for Medicare and Medicaid Services, exercised his right to review the PRRB's decision. *See* 42 U.S.C. § 1395*oo*(f)(1). After receiving briefs from all interested parties, the Administrator reversed the PRRB's decision and issued a final decision on behalf of the Secretary. The Administrator

concluded that payments made by Medicare were only intended to reimburse teaching hospitals for resident time spent at the specific hospital. Accordingly, the Administrator concluded that the MAC properly reduced Beaumont's direct GME and IME FTE resident counts to exclude FTE resident training time in another teaching hospital. Beaumont appealed the Secretary's decision to the Court.

## III.   STANDARD OF REVIEW

"Providers shall have the right to obtain judicial review of any final decision of the Board." 42 U.S.C. § 1395*oo*(f)(1). *Ass'n of Am. Med. Colls. v. Califano*, 569 F.2d 101, 108 (D.C. Cir. 1977). So says the Medicare Act.

The Court uses the *Chevron* standard to review an appeal from an administrative agency because "Congress delegated authority to the agency generally to make rules carrying the force of law" and the agency interpretation was "promulgated in the exercise of that authority." *United States v. Mead Corp.,* 533 U.S. 218, 226–27, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001).

*Chevron* sets forth a two-step framework to resolve questions of statutory interpretation in reviewing administrative decisions. *See* 5 U.S.C. §§ 706(2)(A), (C). First, the Court inquires whether "Congress has directly

spoken to the precise question at issue." *Chevron,* 467 U.S. at 842, 104 S.Ct. 2778. The construction of the statute controls if the Court can determine "the unambiguously expressed intent of Congress." *Id.* at 843, 104 S.Ct. 2778. However, if the statute is ambiguous, the court must determine whether Congress delegated authority – whether implicit or explicit – to the agency to "elucidate a specific provision of the statute by regulation." *Id.* at 843–44, 104 S.Ct. 2778. If Congress expressly delegated authority, the agency's "legislative regulations" made pursuant to that delegation "are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *Id.* at 844, 104 S.Ct. 2778. On the other hand, if congressional delegation is implicit, "a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the Administrator of an agency." *Id.*

"The scope of review of the District Court is limited to a transcript of the record upon which the administrative agency made its findings and decision…Findings of fact made by the Secretary through his administrative agency are conclusive if supported by substantial evidence." (Section 405(g), Title 42, U.S.C.) (quoting *Prewitt v. Celebrezze*, 330 F.2d 93, 94 (6th Cir. 1964)).

## A. Administrator's Decision and APA Review

Pursuant to the Medicare Act, the court reviews the Administrator's decision in accordance with the standard of review set forth in the Administrative Procedure Act (APA). 42 U.S.C. § 1395oo(f)(1); *Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994). Under the APA, the Court can set aside an agency decision if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "unsupported by substantial evidence in a case ... otherwise reviewed on the record of an agency hearing provided by statute." 5 U.S.C. § 706(2)(A), (E). Interpretive guides are without the force of law but are entitled to some deference. *Furlong v. Shalala,* 156 F.3d 384, 393 (2d Cir.1998).

The scope of review is narrow, and a court must not substitute its judgment for that of the agency. *Motor Veh. Mfrs. Ass'n v. State Farm Mutual Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). If CMS "examined the relevant data and articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made," the Court will not overturn an agency's final decision. *MD Pharm., Inc. v. Drug Enforcement Admin.,* 133 F.3d 8, 16 (D.C.Cir.1998). The provider has the burden to show that the agency action violates the APA

standards. *St. Joseph's Hosp. (Marshfield, Wis.) v. Bowen,* 1988 WL 235541, at *3 (D.D.C. Apr. 15, 1988).

### B. Summary Judgment

Under Federal Rule of Civil Procedure 56(a), "[t]he Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The movant bears the initial burden to inform the Court of the basis for its motion, and must identify particular portions of the record that demonstrate the absence of a genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant satisfies its burden, the non-moving party must set forth specific facts showing a genuine issue for trial. *Id.* at 324. Unsupported, conclusory statements are insufficient to establish a factual dispute to defeat summary judgment, as is the "mere existence of a scintilla of evidence in support of the [non-movant's] position"; the evidence must be such that a reasonable jury could find in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *Alexander v. CareSource*, 576 F.3d 551, 560 (6th Cir. 2009).

In deciding a summary judgment motion, the Court "views the factual evidence and draws all reasonable inferences in favor of the nonmoving party." *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

The Court need only consider the cited materials, but it may consider other evidence in the record. Fed. R. Civ. P. 56(c)(3). The Court's function at the summary judgment stage "is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 249.

"The standard of review for cross-motions for summary judgment does not differ from the standard applied when a motion is filed by only one party to the litigation." *Lee v. City of Columbus*, 636 F.3d 245, 249 (6th Cir. 2011). When reviewing cross-motions for summary judgment, the Court must assess each motion on its own merits. *Federal Ins. Co. v. Hartford Steam Boiler Insp. and Ins. Co.*, 415 F.3d 487, 493 (6th Cir. 2005). "[T]he filing of cross-motions for summary judgment does not necessarily mean that an award of summary judgment is appropriate." *Spectrum Health Continuing Care Group v. Anna Marie Bowling Irrevocable Trust*, 410 F.3d 304, 309 (6th Cir. 2005).

## IV.    ANALYSIS

The issue in this case is whether Beaumont is entitled to additional reimbursement under the Medicare Act for costs it incurred to train medical residents during fiscal years 2004 through 2007 for residents who spent

partial years training at other teaching hospitals. The Court agrees with the Administrator's decision denying Beaumont additional reimbursement. The Secretary reasonably read the regulation to require an adjustment to FTE caps for out-rotations at different teaching hospitals. The Secretary's decision to deny partial reimbursement was reasonable and not arbitrary, capricious, or in violation of the law.

## A. Congress Gave the Secretary Great Deference to Determine GME and IME Payments

Section 1395ww(h)(1)(A)(3) of the Medicare Act gives great deference to the Secretary in calculating GME payments — Congress empowered the Secretary to "determine, for each hospital with an approved medical residency training program, an approved FTE resident amount for each cost reporting period beginning on or after July 1,1985." 42 U.S.C.A. § 1395ww(h)(2). Notably, the regulation allows the Secretary to apply the terms. *See Ala. Med. Ctr. v. Sebelius,* 572 F.3d 912, 917 (D.C.Cir.2009). Congress gave the Secretary a broad and express delegation. His interpretation of section 1395ww(h)(1)(A)(3) is to be upheld unless it is "manifestly contrary to the statute." *Chevron*, 467 U.S. at 844.

**1. The 2012 Regulation – Which Codified The Language Set Forth In The Preamble – Is A Clarification of The 2007 Regulation**

While the 2007 regulation did not explicitly state that residents training for partial years at multiple hospitals were to be deducted from the FTE cap, the regulation discusses how to treat residents who out rotate for more than one year and the preamble explained how to count residents who out rotated for less than a full training year.

Beaumont interprets the 2007 regulation to permit reimbursement where residents spent partial years outside the teaching hospital. In contrast, the Secretary says he must factor in out rotators, both who spent partial and full years outside the teaching hospital, to establish the FTE Cap. Indeed, in 2012, the Secretary clarified the regulation in the Federal Register via notice and comment procedures:

> "(e) New medical residency training programs. If a hospital establishes a new medical residency training program as defined in paragraph (l) of this section on or after January 1, 1995, the hospital's FTE cap described under paragraph (c) of this section may be adjusted as follows:
>
> > (1) If a hospital had no allopathic or osteopathic residents in its most recent cost reporting period ending on or before December 31, 1996, and it begins training residents in a new medical residency training program(s) for the first time on or after January 1, 1995, but before October 1, 2012, the hospital's unweighted FTE resident cap under paragraph (c) of this section may be adjusted for new residency training programs based on the sum

of the products of the highest number of FTE residents in any program year during the third year of the first new program's existence and the number of years in which residents are expected to complete the program based on the minimum accredited length for each type of program. The adjustment to the cap may not exceed the number of accredited slots available to the hospital for the new program. If a hospital had no allopathic or osteopathic residents in its most recent cost reporting period ending on or before December 31, 1996, and it begins training residents in a new medical residency training program(s) for the first time on or after October 1, 2012, the hospital's unweighted FTE resident cap under paragraph (c) of this section may be adjusted for new residency training programs based on the sum of the products of the highest number of FTE residents in any program year during the fifth year of the first new program's existence and the number of years in which residents are expected to complete the program based on the minimum accredited length for each type of program. The adjustment to the cap may not exceed the number of accredited slots available to the hospital for the new program.

(i) If a hospital begins training residents in a new medical residency training program(s) for the first time on or after January 1, 1995, but before October 1, 2012, and if the residents are spending portions of a program year (or years) at one hospital and the remainder of the program at another hospital(s), the adjustment to each qualifying hospital's cap for a new medical residency training program(s) is equal to the sum of the products of the highest number of FTE residents in any program year during the third year of the first new program's existence and the number of years in which residents are expected to complete the program based on the minimum accredited length for each type of program and the number of years the residents are training at each respective hospital. If a hospital begins training residents in a new medical residency training program(s) for the first time on or after October 1, 2012, and if the residents are spending portions of a program (or years) at one hospital and the remainder of the program at another hospital(s), the adjustment to

each qualifying hospital's cap for new residency training program (s) is equal to the sum of the products of three factors (limited to the number of accredited slots for each program):

(A) The highest total number of FTE residents trained in any program year during the fifth year of the first new program's existence at all of the hospitals to which the residents in the program rotate;

(B) The number of years in which residents are expected to complete the program, based on the minimum accredited length for each type of program.

(C) The ratio of the number of FTE residents in the new program that trained at the hospital over the entire 5–year period to the total number of FTE residents that trained at all hospitals over the entire 5–year period.

42 C.F.R. § 413.79(e)(1)(2012).

This clarification did not constitute a substantive change in payment policy. In August 1997 – prior to any of the cost reporting years at issue – the Secretary published for comment the following rule for calculating the FTE count for hospitals that established a new medical residency program on or after January 1, 1995. The clarification addressed how to treat residents who spent an entire program year at one hospital and the remaining year at another hospital during the first three years of the residency program:

Sections 413.86(g)(6)(i) and 413.86(g)(6)(ii) specify that the adjustment to the cap is also based on the number of years in which residents are expected to complete each program based on the

minimum accredited length for the type of program. We proposed to add language to clarify how to account for situations in which the residents spend an entire program year (or years) at one hospital and the remaining year (or years) of the program at another hospital. In this situation, the adjustment to the FTE cap is based on the number of years the residents are training at each hospital, not the minimum accredited length for the type of program. If we were to use the minimum accredited length for the program in this case, the total adjustment to the cap for both hospitals might exceed the total accredited slots available to the hospitals participating in the program. In the May 12, 1998 final rule (63 FR 26334), we specified that the adjustment to the FTE cap may not exceed the number of accredited resident slots available

64 Fed. Reg. 41490, 41542 (July 30, 1999).

The language corresponding to this pronouncement was set forth in the regulation at 42 CFR 413.86(g)(6)(i)(A)(now 42 CFR 413.79(e)(1)(i)), which states:

If the residents are spending an entire program year (or years) at one hospital and the remainder of the program at another hospital, the adjustment to each respective hospital's cap is equal to the product of the highest number of residents in any program year during the third year of the first program's existence and the number of years the residents are training at each respective hospital.

42 CFR 413.79(e)(1)(i).

## 2. The Secretary's Calculation of FTE Cap Is Entitled to Deference

Under the 2007 regulation, the FTE cap was determined by multiplying the highest FTE count of residents in any program year during the third year

of the three-year cap growth period by the minimum accredited length of the program. For Beaumont, the highest FTE count was the first program year where it had 9.76 GME and 9.76 IME program year one residents. The family medicine residency at Beaumont is three years. Therefore, the MAC multiplied 9.76 by 3 and concluded the total program GME and IME FTE to be 29.28 resident cap. This is undisputed.

The parties disagree whether the 2007 regulation required CMS to apportion the GME and IME caps to each hospital that trained residents in the new program. Beaumont disputes that there should be any adjustment for out-rotations. Alternatively, Beaumont states that – if the Court finds that there should be an accounting for out-rotators – the MAC calculation is wrong and suggests that out-rotations should be subtracted from the total number of residents during the residency program's third year of existence. On the other hand, the Secretary argues the statute requires CMS to apportion the total caps among the three hospitals across all three years. The parties dispute how to effectively calculate the number of residents in accordance with the statute.

The Secretary's interpretation is reasonable and entitled to deference. Congress used similar language in the 2012 regulation – which clarified the 2007 regulation – in codifying that hospitals may not claim time residents

spent training at another hospital using the method set forth by the Administrator. *See Thomas Jefferson Univ.,* 512 U.S. at 517, 114 S.Ct. 2381.The regulations in place during the cost reporting years at issue did not permit a hospital to submit reimbursements for time residents spent training at another hospital during a program year.

### 3. There is "Substantial Evidence" To Support the Secretary's Interpretation. The Administrator's Actions Were Not Arbitrary or Capricious

Beaumont asserts that the decision of the Administrator was contrary to law because the Administrator either applied the 2012 regulation or misinterpreted the 2007 regulation. The Secretary argues the Administrator properly construed the regulatory text to subtract time residents spent training outside the teaching hospital.

The court first determines whether the Administrator's decision was "unsupported by substantial evidence" or "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *See* 5 U.S.C. § 706.

The Administrator's decision satisfies the "substantial evidence" standard. Substantial evidence inquires whether there is relevant evidence – viewed as reasonable – that lends adequate support to a conclusion. *Pierce v. Underwood*, 487 U.S. 552, 565, 108 S.Ct. 2541, 101 L.Ed.2d 490

(1988). "An agency conclusion may be supported by substantial evidence even though a plausible alternative interpretation of the evidence would support a contrary view." *Robinson v. Nat'l Transp. Safety Bd.*, 28 F.3d 210, 215 (D.C. Cir. 1994). The Court's standard of review is narrow and is "ultimately deferential," *Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607, 705, 100 S.Ct. 2844, 65 L.Ed.2d 1010 (1980).

The Administrator concluded that Beaumont should have known that it would not have been entitled to additional reimbursements because the preamble noted that out rotators – who spent time at other teaching hospitals for some, but not all of the year – were to be excluded from the teaching hospital's FTE Count.

Beaumont argues the 1999 preamble and subsequent rulemaking should not persuade this Court because the "provision did not remotely appear in the codified text until the promulgation of the 2012 regulation." (Doc # 11-1; Pg ID 190). However, while it is true there was no codification; nonetheless, interpretive guides are entitled to some weight. *Furlong v. Shalala,* 156 F.3d 384, 393 (2d Cir.1998). The Administrator's decision therefore is supported by the evidentiary record. This explanation satisfies the "substantial evidence" standard.

Similarly, the Administrator did not act "arbitrarily and capriciously." The Board plainly considered the facts before it and applied the standard to these facts. *See* AR 88–89. The BBA highlights that Congress recognized "complex issues" would result from instituting the FTE resident cap and authorized the Secretary to set forth regulations to address these complex issues. *See* H.R. Conf. Rep., at 821–22 (1997), *as reprinted in* 1997 U.S.C.C.A.N. 176, 442–43; *see also Pauley v. BethEnergy Mines, Inc.,* 501 U.S. 680, 696, 111 S.Ct. 2524, 115 L.Ed.2d 604 (1991) ("When Congress, through express delegation ... has delegated policy-making authority to an administrative agency, the extent of judicial review of the agency's policy determinations is limited.").

Given Congress's delegation of authority to the Secretary and without compelling evidence in the legislative record highlighting that Congress intended to interpret the BBA in the manner set forth by Beaumont, the Court defers to the Secretary's position; it is a reasonable one. *See Chevron,* 467 U.S. at 842, 104 S.Ct. 2778; *Sea–Land Serv., Inc.,* 137 F.3d at 645.

### 4. The Administrator's Decision Was Reasonable

Because the Administrator's decision is supported by substantial evidence and was not contrary to law, the court gives substantial deference

to the Secretary's interpretation of its own ambiguous regulatory language. In doing so, the court assesses whether an agency, in rendering its decision, "examined the relevant data and articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Veh. Mfrs. Ass'n.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)). An agency explanation must contain "a rational connection between the facts found and the choice made."

An agency's decision need not "be a model of analytic precision to survive a challenge" and "[a] reviewing party will 'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.'' *Dickerson v. Sec'y of Def.,* 68 F.3d 1396, 1404 (D.C. 1995). The agency must "provide an explanation that will enable the court to evaluate the agency's rationale at the time of decision." *Id.*

As previously discussed, the Secretary stated his position in the preamble and further clarified it in the 2012 regulation that hospitals may not include time residents spent rotating at outside hospitals as part of its FTE cap. *See Kennecott Utah Copper Corp. v. U.S. Dep't of Interior,* 88 F.3d 1191, 1223 (D.C.Cir.1996) (a preamble to a rule could have independent legal effect when an agency "inten[ds] to bind either itself or regulated parties" and holding that even "absent an express statement to that effect, [a

court] may infer that the agency intended the preamble to be binding if what it requires is sufficiently clear"); *see also Martin v. Occupational Safety & Health Review Comm'n,* 499 U.S. 144, 150, 111 S.Ct. 1171, 113 L.Ed.2d 117 (1991) ("[A]n agency's construction of its own regulations is entitled to substantial deference.").

Beaumont claims that the Administrator acted arbitrarily and capriciously. However, the Administrator reasonably inferred that – pursuant to the 1999 preamble – Beaumont was not permitted to count residents in its FTE cap who out-rotated for less than one year.

Accordingly, the court concludes that the Administrator did not act arbitrarily or capriciously when denying Beaumont additional reimbursement funding. *See MD Pharm., Inc.,* 133 F.3d at 16 (agency's actions were not arbitrary or capricious because the agency had examined the evidence and "articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made.") The Administrator's decision is supported by substantial evidence and was not contrary to law.

## B. Court May Not Impose New Standard For Calculating GME or IME

In the alternative, Beaumont asks the court to impose its proposed standard and interpretation of the regulation. Beaumont argues that this Court should impose a new standard calculation, if this Court does not agree with the standards imposed by the Secretary. However, "[A] court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the Administrator of an agency." *Chevron,* at 844 (agency's "legislative regulations" made pursuant to express delegation of authority "are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute").

The Court declines Beaumont's request.

## V. CONCLUSION

The Court **GRANTS** Defendant's Motion for Summary Judgment and **DENIES** Plaintiff's Motion for Summary Judgment.

**IT IS ORDERED**.

s/ Victoria A. Roberts
Victoria A. Roberts
United States District Judge

Dated: October 24, 2019